## Case No. 12,669

### The SENECA.

[See Case No. 16,251.]

## Case No. 12,670.

### The SENECA.

[3 Wall. Jr. 395;[1] 6 Pa. Law J. 213; 18 Am. Jur. 486; 4 Haz. Reg. Pa. 248.]

Circuit Court, E. D. Pennsylvania. April Term, 1829.[2]

SHIPPING—MASTER—POWER TO APPOINT—DISAGREEMENT OF OWNERS—COMPULSORY SALE OF VESSEL.

1. Where two equal joint owners of a ship, differing as to which of the two was entitled to appoint the master, there being no difference between them, as to the destination of the vessel, and one of them insisting to undertake a voyage in person, as master, in opposition to the will and equal rights of the other part owner, the other applied by petition, asking either for the sale of the joint property, or that he might be permitted to send the vessel to sea under a master of his own appointment; *held*, that a sale of the vessel ought to be decreed.

[Cited in Tunno v. The Betsina, Case No. 14,236; The Ocean Belle, Id. 10,402; Coyne v. Caples, 8 Fed. 640; Head v. Amoskeag Manuf'g Co., 113 U. S. 23, 5 Sup. Ct. 447.]

2. The jurisdiction of the district court, under the 9th section of the judiciary act of 1789 [1 Stat. 76], embraces all cases of a maritime nature, whether they be particularly of admiralty cognizance or not; and such jurisdiction, and the law regulating its exercise, are to be sought for in the general maritime laws of nations, and are not confined to that of England, or any other particular maritime nation.

[Cited in Tunno v. The Betsina, Case No. 14,236; Kynoch v. The S. C. Ives, Id. 7,-958.]

[See The Comet, Case No. 3,050; Haller v. Fox, 51 Fed. 298.]

3. The provisions of the French marine law which authorize a compulsory sale of a vessel, in case of partners disagreeing about the use of her, are part of the general law of admiralty binding on the courts of the country.

[Cited in Tunno v. The Betsina, Case No. 14,-236.]

This case came before this court by appeal from the district court, in which a petition was filed on the 4th of December, 1828, by Davis & Brooks, merchants of the city of New York, stating that they were owners of one-half of the brig Seneca, then lying in the port of Philadelphia, and that the remaining half part belonged to Captain Hen-

[1] [Reported by John William Wallace, Esq., and here reprinted by permission.]

[2] [Reversing Case No. 3,650.]

ry Levely; that Captain Levely had had possession of the brig for several months, having the sole control thereof, and had proceeded on certain voyages to the detriment and dissatisfaction of the late part owners (from whom the brig was purchased by the petitioners), and then again threatened to take the vessel to sea without the consent of the petitioners, and to their great detriment; the petitioners further stated that finding themselves in a very inconvenient situation by the conduct of Captain Levely, they had repeatedly offered to sell their share to him at a reasonable price, or to purchase his share on sufficient terms, or to sell the entire vessel at a public sale, or to send her to sea with a master appointed by themselves; but that the said Captain Levely had obstinately refused to adopt either of these courses, and persisted in declaring that he would take the vessel to sea. In consideration of these circumstances, the petitioners prayed an attachment against the vessel, and a citation to Captain Levely to show cause, why the court should not grant an order for the sale of the said vessel; or why the petitioners should not be permitted to send her to sea with a master appointed by themselves. The attachment and citation were granted—and after argument, the judge of the district court (Judge Hopkinson) delivered an elaborate opinion against the authority of the court to order a sale of the vessel, and decreed that neither of the prayers of the petitioners could be granted and that the petition be dismissed. [Case No. 3,650]. From this decree the petitioners appealed. After the cause came into this court, the appellants obtained leave to amend their petition, which amended petition, after repeating the various offers made by them to the respondent, as set forth in the original petition, and with more precision as to the last of them, stated their offer that the brig should be sent to sea on a designated voyage, under the charge of a master to be agreed upon by both parties, all of which offers they stated were refused. That the respondent had obtained and now retains possession of the brig, in an illegal manner, and against the will of the petitioners,— that he had recently appointed a master to command her, without the assent of the petitioners, and now threatens to send her on a voyage under the person so appointed by himself, without their concurrence and against their consent, whereby they would be deprived of their moiety of the profits of the vessel. The prayer was, that the respondent might be restrained from taking or sending the brig to sea, and that a sale of the brig be decreed, or that the petitioners might be permitted to send the vessel to sea on a voyage proposed by them. The amended answer denied that the offers stated in the amended petition were made;—it stated that the respondent proposed to the petitioners that she should be fitted out and employ-

ed, but that they refused to expend a dollar upon her, and would rather see her rot at the wharves than have anything to do with her;—that the respondent then determined to fit her for sea; and after he had fully repaired her, at a great expense, and was ready to proceed to sea, he was stopped by the process issued from the district court;—he affirmed that it never was his intention to send her to sea under the command of the person mentioned in the petition, his determination being to command her himself on the projected voyage.

The new evidence taken in this court tended to prove the following facts: 1. That the petitioners objected to incurring any expense for the repairs or outfit of the vessel for a voyage to be conducted by the respondent as her master. 2. That they expressed their willingness to take possession of the brig, and to employ her under a skilful master, and to give bonds to account for her earnings; or to sell their moiety of her to the respondent for 1500 dollars, as she stood, before she was repaired. 3. That they offered to the agent of the respondent, that the brig should go to sea under another master than the respondent, and that they sent on a person to take command of her; but possession of her was refused. That a specific voyage to Wilmington, in North Carolina, was proposed by Henshaw, under whom the petitioners claimed, and who acted as the representative of the petitioners claiming a lien on the vessel.

[Libelants moved for leave to enter an appeal, which was allowed. Case No. 3,651.]

Wharton & Sergeant, for appellants.
Binney & Chauncey, for appellee.

WASHINGTON, Circuit Justice. The novelty, as well as the difficulty of this case, well entitles it to the labor, the talents, and the learning which have been bestowed upon it at the bar. It is not my intention to follow the counsel over the whole ground which they have so ably occupied, much less to express an opinion upon many of the topics which they have discussed. In the unsettled state of admiralty jurisdiction and admiralty law in the United States, I think it is the safest course to advance step by step in deciding the many new, and often intricate questions to which those subjects may give rise. Influenced by this consideration, I shall confine my observations to the precise case before me; which, from the amended pleadings and the new evidence exhibited in this court, I find to be that of joint owners of a vessel, having equal interests in her, each willing and desirous to employ her in navigation, but upon his own terms, and neither willing to do so upon any other. The terms upon which the appellants desire it are, that she may be commanded by a master of their appointment, and, at all events that Levely should not be that mas-

ter. The appellee objects altogether to those terms, and claims to take her to sea under his sole command. It is manifest, therefore, that the difference between these owners, is not, whether the vessel shall be employed, but which of them shall be entitled to appoint the master; and, that upon this point, all prospect of compromise is hopeless. They do not differ, it is true, as to the destination of the vessel, because, until this preliminary matter of disagreement was adjusted, it was unnecessary for either to propose or to discuss the expediency of any particular voyage. But I consider it to be entirely unimportant to the decision of this case, whether the subject of difference be the appointment of the master, or the particular destination of the vessel, if the consequence in either case, as to the employment of the vessel must be the same.

In this state of things, the respondent, assuming to act as master, and insisting to undertake a voyage in opposition to the will, and to the equal rights of the other part owners, the latter applied by petition to the district court to decree a sale of the joint property, or that they might be permitted to send the vessel to sea under a master of their own appointment. The important question presented by this petition was, had that court jurisdiction and authority to decree a sale, and a division of the proceeds?

As preliminary to the investigation of this question, I not only admit, but insist,

First, that the judicial power of the United States under the constitution—and the jurisdiction of the district courts, under the 9th section of the judiciary act of 1789—embrace all cases of maritime nature, whether they be particularly of admiralty cognizance or not.

Second, that this jurisdiction, and the law regulating its exercise, are to be sought for in the general maritime law of nations, and are not confined to that of England, or any other particular maritime nation.

Lastly, that the present is a case of admiralty and maritime cognizance, since it involves a dispute between part owners of a vessel, concerning the disposition and employment of her in navigating the sea.

But these positions, if they be correctly taken and admitted, overcome only a part of the difficulties which this case presents. We are still left to inquire, does this maritime law authorize a sale of the property in a case like the present? And where is that law to be found? For I cannot agree with the appellant's counsel, that if the jurisdiction of the court be established, the authority follows as a corollary. The circuit courts of the United States have a common law jurisdiction in all the cases to which it is extended by the constitution and acts of congress; but the rules by which they are authorized to decide on any given case, must be sought for in the law of the land.

Where then is the law applicable to this

case to be found? Not in the practice, or adjudications, of the admiralty court of England. The case of Ouston v. Hebden, 1 Wils. 101, and that of The Apollo, 1 Hagg. Adm. 306, are conclusive both against the jurisdiction and the authority of that court.

We next pass to those great sources of maritime jurisprudence, the Rhodian law, and the laws of Oleron and Wisbuy, in neither of which do we find any provision made for a case similar to the present.

Our attention is then invited to the civil law, or rather to the Roman Marine Code, another legitimate source of general maritime law; in which we find sundry wise provisions for adjusting disputes between part owners of vessels, from which the three following rules may be deduced.

1. That the opinion and decision of the majority in interest of the owners, concerning the employment of the vessel, is to govern, and therefore they may, on any probable design, freight out or send the ship to sea, though against the will of the minority.

2. But if the majority refuse to employ the vessel, though they cannot be compelled to it by the minority, neither can their refusal keep the vessel idle, to the injury of the minority or to the public detriment; and since in such a case the minority can neither employ her themselves nor force the majority to do so, the vessel may be valued and sold.

3. If the interest of the owners be equal, and they differ about the employment of the vessel, one half being in favor of employing her, and the other opposed to it, in that case the willing owner may send her out.

It is manifest that neither of these rules applies to the present case, in which there are no unequal interests and no unwilling owner, each being desirous, and equally so, to employ the vessel.

In the further prosecution of our inquiries, we are naturally led to an examination of the Marine Code of France,—to those celebrated ordinances of Louis XIV., published to the maritime nations of Europe as early as the year 1681. The 5th and 6th articles of this Code, cited, and learnedly commented upon by Valin (page 564) will alone be noticed. The former is substantially the same as the first rule of the Roman law before referred to. The latter is as follows:

"No person may constrain his partner to proceed to the public sale of a ship held in common, except the opinions of the owners be equally divided about the undertaking of some voyage."

There is certainly some ambiguity in the phraseology of this article, and, unexplained, it might be construed to mean no more than is expressed in the third rule of the Roman law before noticed, applying to owners having equal interests. But Valin leaves no room for doubt as to the true exposition of the article. In his first volume (page 585) he says: "The case excepted in this article is, when 'the opinions of the parties are equally divided on the undertaking of some voyage,' upon which we may remark, that the question is not of two equal opinions, of which one is to leave the vessel without any kind of voyage, and the other to undertake such and such kind of voyage, there being no doubt in that case that the opinion favorable to a voyage ought to prevail, saving the right to discuss the projected voyage; but solely, of the case of two opinions equally divided upon the particular enterprise projected by one moiety of the persons interested, and rejected by the other moiety, whether that moiety proposes on its part another voyage, or confines itself to a disapproval of it, provided, nevertheless, that it gives plausible reasons for its conduct; otherwise this would have the air of an absolute refusal to permit the vessel to be navigated, which justice could not tolerate, being contrary to the object of the vessel, to the original intention of the parties, and to the interests of commerce.".

This article, thus explained, embraces the present case, unless it could be successfully contended that there is a substantial difference between a disagreement respecting the particular voyage proposed and discussed, and the appointment of the master to conduct the voyage. The reason strikes me to be the same in the one case as in the other, and the consequences to the parties, to their original intention, to the object of the vessel, and to the interests of commerce, are precisely the same. In the one case as in the other, the vessel must remain unemployed, since neither owner can, otherwise than tortiously, send her to sea, against the will of the other. And were he to persist in doing so, is there no power in a court possessed of general maritime jurisdiction, to restrain him? I am not prepared to admit so monstrous a legal solecism as the denial of this authority would seem to imply.

But the ordinance provides that the party objecting to the voyage must assign a plausible reason for his conduct, in order to repel a presumption that his objection is founded on an unwillingness to employ the vessel at all. And is it not more than a plausible reason for one owner to allege his equal right to employ the person to whose care his property is to be entrusted, and to object to the one selected by the other owner, upon the ground of his want of confidence in the skill or in the integrity of the person so selected? I am far from saying, or even believing, that, in point of fact, the objection to Captain Levely is well founded, since there is no proof in the cause to substantiate it; but if it be honestly entertained by the appellants, it is not for this court to decide that it is futile, and merely urged as a pretext for detaining the vessel in port.

Having ascertained the true meaning of this article of the French Marine Ordinances, its authority, or the influence which it

should have in deciding this cause, is next to be considered.

It is insisted by the counsel for the appellee, that this article is nothing more than a part of the local law of France, founded upon 'the Roman law of licitation, adopted by France, applicable to the partition of property, movable and immovable, which is held in common by two or more persons, which, without a sale, could not be otherwise conveniently divided between them; and, in support of this argument, it is remarked that the expressions of the article are all negative, and must necessarily refer to some other code whenever the excepted case shall occur.

The ingenuity and the imposing appearance of this argument are freely acknowledged; but it will not, I think, bear a close examination. For, admitting the general law of licitation to have formed a part of the local law of France, it does not follow that an ordinance restraining and qualifying that law in cases, and in relation to subjects purely maritime in their nature, should likewise form a part of the local law of that country. It would rather seem that, on account of their maritime character, it was deemed proper to withdraw such subjects from the local, for the purpose of incorporating them into the general marine code of the nation. That the 5th article is of this description, has not been questioned; it was no doubt copied from the Roman Maritime Code, which having also provided for cases of disputes between the owners of unequal interests, as well as between those having equal interests in one event only, it would seem as if the 6th article had been introduced for the purpose of perfecting the system, by affording a remedy, in another event for which the Roman law had made no provision. It is most obvious, in short, that Valin, as well as other jurists who have treated of these articles, have considered them, not as part of the common, but of the maritime law of France, and we find provisions similar to them in principle introduced into the Code de Commerce of that country.

That the ordinances of Louis XIV. are not of binding authority upon the maritime courts of other countries I freely admit; but as affording evidence of the general maritime law of nations, they have been respected by the maritime courts of all nations, and adopted by most, if not by all of them, on the continent of Europe. We are informed that this Code was compiled from the prevailing maritime regulations of France, and of other nations, as well as from the experience of the most respectable commercial men of France. And why should not such parts of it as are purely of a general maritime character, which are adapted to the commercial state of this country, and are not inconsistent with the municipal regulations by which our courts are governed, be followed by the courts of the United States in

questions of a maritime nature? I leave this question to be answered by those who would restrain the admiralty jurisdiction of the district court within the limits allowed by the common law courts of England to be exercised by the high court of admiralty of that country.

And why, let me again ask, shall the 6th article of this Code be rejected in the case now under consideration? Neither justice nor policy requires it. For it is manifest that the appellants must either surrender their property in this vessel, or rather the fruits of it, to the appellee, or their equal right to appoint the master, and to decide upon her destination, or that she must remain idle in port until the subject in dispute is totally lost to both the owners. There is no other imaginable alternative, unless it be the one which the appellants ask for. For if the appellee may now legally claim the right to take this vessel to sea, and, by giving security for her safe return, may take to himself, in exclusion of the other part owners, all the earnings of the voyage, his right to employ her, on the same terms, as long as she shall be in a condition to be navigated, will continue equally valid, and the exercise of it can no more be denied then than now.

Suppose, for the purpose of further illustrating this part of the subject, these parties had filed cross petitions, setting forth the difference between them respecting the appointment of a master, and each praying to be permitted to take the vessel to sea under the usual stipulations, since neither could entitle himself to a preference, what could the court do but dismiss both petitions, and thus leave the vessel unemployed; unprofitable to both parties and to the interests of commerce, and subject to all the injury to which such a state of things would expose her. Yet this is substantially the present case; and if the court has no power to decree a sale, it is clear that neither of the parties can take the vessel to sea without a decree of the district court authorizing him to do so.

Upon the whole, considering the article of the French Code, which has so often been referred to, as constituting a part of the maritime laws of nations—that it is in itself a wise and equitable provision—that it is not inconsistent with the commercial state of this country, or with any law which should govern this court, I feel myself not only at liberty, but bound to adopt and apply it to the present case, and I shall therefore reverse the sentence of the district court, and decree a sale of this vessel.

My opinion, I acknowledge, was very different when this cause was opened, from that which I now entertain. I had read that which was pronounced in the district court by the learned judge of that court, with an entire conviction of its correctness. But the new evidence which has been intro-

duced in this court, presents, in at least one most essential particular, a different case from that which was submitted to the view of that court.

———

SENECA, The (DAVIS v.). See Cases Nos. 3,650 and 3,651.

SENECA, The (UNITED STATES v.). See Case No. 16,251.

SERAT (SANDERSON v.). See Case No. 12,300.

SERPENT, The (FRENCH v.). See Case No. 5,103a.